(5 App. Div. 540.)

CUMMINGS et al. v. ZIMMER.

(Supreme Court, Appellate Division, Third Department.    May 21, 1896.)

EVIDENCE—WEIGHT AND SUFFICIENCY.
On an issue as to whether plaintiff had returned all the hides received from defendant to be tanned, it appeared that defendant had purchased the hides from one H., a dealer, who received them in bundles with invoices giving the number in each; that H. opened and counted enough of the bundles to satisfy him that they contained the invoice number, but did not count all of them, and that they were sold to defendant from the invoice counts. Defendant purchased from H. several lots of hides, among which were four lots of a grade known as "deacons," containing, according to the invoices, 1,580, 1,570, 2,499, and 840 hides, respectively. H. and one of his employés testified that the several lots were delivered to and taken away by S., an employé of plaintiff. S. testified that he received the two lots of 1,580 and 1,570. The lot containing 2,499 was accounted for by plaintiff, but of the others there was a shortage of 1,595. *Held*, that a finding that plaintiff returned all the hides was not sustained by the evidence.

Appeal from judgment on report of referee.

Action by Curtis S. Cummings and another against Alvah J. Zimmer to recover for services alleged to have been rendered by plaintiffs for defendant. There was a judgment in favor of plaintiffs, and defendant appeals. Reversed.

Argued before PARKER, P. J., and LANDON, HERRICK, MERWIN, and PUTNAM, JJ.

N. H. Anibal, for appellant.
Spencer & Banker, for respondents.

PARKER, P. J.    This action is brought to recover for services rendered the defendant in tanning for him a large number of hides, at various times between March 2 and June 21, 1893.    There is no claim but that the plaintiffs tanned and prepared, between those dates, the number of hides for which they have charged, and that the prices charged therefor were those agreed upon, except that the defendant claimed a discount of 6 per cent. on the whole amount of the bill, which has been allowed him by the referee. The contest was over the claim, by defendant, that he had delivered to plaintiffs 1,595 more hides than were tanned and returned to him, and he sought to set off the value of such hides against the plaintiffs' demand.    The referee has disallowed such claim, and reported in favor of the plaintiffs for the full amount of their bill, less the 6 per cent. discount, and from the judgment entered thereon the defendant brings this appeal.

A careful examination of the evidence in this case leads us to the conclusion that it hardly sustains the findings of the referee. The defendant commenced furnishing hides· to plaintiffs, to be tanned for him, in October, 1892.    From that date up to the time the bill annexed to the complaint in this action was rendered to him, he claims to have delivered 9,855 hides.    These hides were all purchased by defendant from Hollett, who was a dealer in hides at Gloversville, and to whom they were shipped in cars from

other places. They seem to have come to Hollett in different lots, done up in bundles, with a specified number of hides in a bundle, and an invoice accompanied each lot. When received by Hollett, they were unloaded from the cars, some in the railroad freight house, and some in his hide house. Enough of the bundles were opened and counted to satisfy Hollett and his assistants that the bundles were full, and would hold out, and beyond that only the number of bundles were counted to verify the amount charged in the invoice. They were sold by Hollett to the defendant in lots, as they came to him, and from the invoice count. Some eight different lots of hides, consisting of "veals," "deacons," and "grasses," and each lot containing a different number, were sold; and it appears, from the evidence of Hollett and his employé, Hart, that such lots were delivered to the plaintiffs at the hide house and the freight house, and taken away by their employé, Stewart. Among these lots was a lot of 1,580 wet deacons, and another lot of 1,570 dry deacons. There was also a lot of 2,499 deacons, being the first lot of hides purchased from Hollett, and another lot of 840 deacons, and these lots were the only deacons in the whole purchase. Now, all of the hides which the defendant claims to have so purchased and to have paid Hollett for at the invoice count are accounted for in the bill rendered by plaintiffs as having been tanned, except 1,595 deacons. The lot of 2,499 deacons is accounted for in such bill, as one lot No. 9, except that it is there given as 2,495,—a shortage of only four hides. It seems, therefore, that the shortage complained of must have occurred in the other three lots. It is true that the hides were not all counted by Hollett or the defendant. The invoice count was taken to be correct in their deal. But it is hardly credible that so large a shortage can be accounted for by a deficiency in their count. Both Hollett and the defendant testify that they saw the different lots, and tell just where they were piled, and say that they could judge very closely, from the size of the bundles and piles, the amount of hides that were there. The lot of 2,499 deacons would seem to have gone to plaintiffs, and to have been tanned by them. They are specified in their bill of hides as tanned and returned. Of the other three lots, one whole lot, and more, has never been returned. It is quite clear that both of the two lots of 1,580 and 1,570 were taken by Stewart. He testifies that he hauled them, and tells where he stored them at plaintiffs' works; and, under the circumstances, the weight of evidence seems to be that the plaintiffs had them, and should account for whatever they actually contained. When Stewart delivered to Mingus, the plaintiffs' employé at the tannery, the hides which he drew, Mingus did not open and count the bundles. That was not done until they were put into the works, and all had not been opened and so counted when Mingus left plaintiffs' employment. The bundles were counted and piled, some in an open shed and some in other places, and his system of counting was no better or more accurate than was the one adopted by Hollett and defendant. It seems quite plain that all of the eight different lots which were sold by Hollett to de-

fendant were delivered to the plaintiffs; that is, they were taken by their man at the hide and freight houses, and that amounts to a delivery, and makes them responsible for all he took. According to the count as invoiced to Hollett, such lots amounted to the number which defendant claims; and, while such count is not as accurate and satisfactory as if each hide had been counted, we cannot believe that it fell short to so great an amount as 1,595 hides.

It seems to us that, on the evidence, plaintiffs can be fairly charged with as many hides as were in the several lots of deacons which were purchased of Hollett. Such lots were apart by themselves, and easily identified, and Hart, Hollett, and Stewart all seem to agree that all of them were received by Stewart, and hauled away by him. As to the number of hides in those lots, the count made by Hollett and the defendant, and their estimate of them, was as carefully made as, and seems much more likely to be correct, than that made by the plaintiffs. Out of the three lots from which the shortage must have come, viz. the 1,580, the 1,570, and the 840 lots, the first two were certainly received by plaintiffs; and the shortage amounts to more than one-third of the whole. It is not reasonable to suppose that so large a deficiency arises from a shortage in the bundles as invoiced. The defendant and Hollett, who both inspected them, and Hollett and his men, who counted the bundles, could estimate much nearer than that, and would have at once noticed such a discrepancy. Hollett could not have sold, and defendant would not have purchased, had such a shortage existed in the several lots when unloaded and inspected by them. It is more likely that so great a loss has occurred after they went into plaintiffs' possession, either by being mixed with other hides in process of tanning, or by theft from their sheds. For these reasons, we conclude that the judgment should be reversed.

Judgment reversed, referee discharged, and a new trial granted, costs to abide the event. All concur.